UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIRELA USELMANN, *et al.*,

          Plaintiffs,

v.

          Case No.: 2:19-cv-13652
          Honorable Gershwin A. Drain

RAZVAN POP, *et al.*,

          Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [#109]

### I.   INTRODUCTION

Plaintiffs Mirela Uselmann, Gabriel Biclea, Ion Gutu, and Dumitru Marius Rendenciuc on behalf of themselves and those similarly situated filed the instant action claiming they were defrauded in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).  On January 27, 2023, this Court granted the Plaintiffs' Motion for Class Certification.  ECF No. 83.  The class that was certified includes all driver/owner-operators who had contracts with Defendant RSP Express Inc. ("RSP") from 2010 to 2015.

Now before the Court is the Plaintiffs' Motion for Partial Summary Judgment.  This matter is fully briefed; and upon review of the parties'

submissions, the Court concludes that oral argument will not aid in the disposition of this matter. Accordingly, the Court will resolve the present motion on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, the Court grants Plaintiffs' Motion for Partial Summary Judgment.

## II.     FACTUAL BACKGROUND

Plaintiffs are truck drivers/owner-operators who transported freight on behalf of Defendant, RSP Express Inc. ("RSP"), an over-the-road freight transportation company. RSP is owned and operated by Defendants Razvan Pop and Maria Pop. Defendants had contracts with each of the individual Plaintiffs and their company alter egos. Under their contracts, Plaintiffs agreed to transport freight exclusively for RSP and, in exchange, RSP agreed to pay the owner-operators a sum equal to 80% of the gross revenue received by RSP. Each contract included paragraph 20, which states: "No interpretation, change or waiver or [sic] any of the provisions hereof shall be binding upon the parties hereto unless mutually agreed to in writing and signed by both parties." ECF No. 49, PageID.1633.

Defendant RSP's Manager, Ramona Marinescu, testified at her deposition that Plaintiffs would be assigned loads by the dispatcher who would tell the drivers the location, pickup, times, customer requirements, route and amount. *Id.*, PageID.1604. Marinescu indicated that "[w]hen the dispatcher assigns a job, the

dispatcher is giving an amount to the owner operator and the amount is the gross and then the owner operator is being paid 80 percent of that amount." *Id.*, PageID.1601.

According to Marinescu, the "amount" was not what Defendants actually paid, but was an amount determined by the dispatcher after consultation with Mr. Pop. *Id.*, PageID.1607. The owner operators were not informed how much the Defendants were actually getting paid, i.e., the actual gross revenue. *Id.*, PageID.1597. The owner operators would not be able to determine whether the amount they were given by the dispatcher was in fact 80% of gross revenue until they would receive their weekly Driver Settlement Statements in the mail to confirm. *Id.*; ECF No. 42-8, PageID.1291; ECF No. 42-9, PageID.1230.

Marinescu further testified that none of the Driver Settlement Statements reflected how much Defendants were actually paid on the loads. ECF No. 49, PageID.1598. She further explained that the amount provided to the owner-operators on the Settlement Statements and referred to as "revenue" was the amount that was already provided to the owner-operators by the dispatcher. *Id.*, PageID.1606. Marinescu testified the actual amount paid to the owner-operators per load can only be found on the invoices that she prepared and sent to RSP's customers. *Id.*, PageID.1599, 1606. However, the invoices were never provided to

the owner-operators. *Id*. This procedure was followed uniformly across all owner-operators. *Id*., PageID.1605.

During discovery, Defendants produced two reports from Dr. Dispatch—a computer program that Defendants used to record both accounts receivable and payroll. One report is entitled "Driver Payroll History," and the other report is entitled "Fleet Revenue Report." In the left-hand column of the Driver Payroll History is a column of invoice numbers, i.e., the bills sent to the customer for the gross charges for the job. ECF No. 49-7, PageID.1636. The sixth column is entitled "Revenue," but it did not disclose the actual total amount billed to RSP's customers. *Id*. The column "Amt. Paid" is the amount paid to the drivers. *Id*. When comparing the "Amt. Paid" column and the "Revenue" column, the "Amt. Paid" column appears to be exactly 80% of the "Revenue." *Id*. The Fleet Revenue Report's fourth column had the same heading as the Driver Payroll History report, namely "Revenue." On the Fleet Revenue Report, however, the "Revenue" column was actually the invoice price to RSP's customers. The owner-operators did not receive the Fleet Revenue Reports. ECF No. 48, PageID.1545.

Marinescu testified that the Fleet Revenue Report's revenue column disclosed a different number than what was disclosed on the Driver Settlement Statements and different than what was disclosed on the Driver Payroll History report's "revenue" column. *Id*. Marinescu could not explain why there were two

4

separate reports and two separate revenue numbers; however, she was clear that the invoices would include the accurate revenue number, and that revenue number was found in the Fleet Revenue Report, which was not disclosed to the owner-operators. Nor did the owner-operators receive the invoices to RSP customers. *Id*. A review of the two reports reveals that the owner-operators were significantly shorted because the invoice price significantly exceeded the revenue price on the Driver Payroll records. Finally, Marinescu admitted that despite Paragraph 20 in the contracts, there were no written agreements mutually agreeing to a change or waiver from the agreed 80% of RSP's total revenue for the load. ECF No. 49, PageID.1603.

Defendant Maria Pop, Defendant RSP's President and co-owner, also was deposed in this matter. Defendant Maria Pop's testimony corroborates the testimony of Marinescu. For instance, Ms. Pop testified as follows:

> Q. Did the owner operators receive 80 percent of the invoice?
> A. Not all the time. Sometimes they received more than 80 percent.
> Q. And sometimes did they receive less?
> A. Yes, sometimes.
> Q. Do you know when they received less?
> A. I really don't know exactly in my knowledge, but I know Ray was trying to equal prices for the drivers which were driving.
> \*         \*         \*
> Q. Do you know what explanation was given to the driver operator when they received less?
> A. No, because they did not get an explanation when they got more than 80 percent.
> Q. So, you are saying they were not told why they were receiving less?

  A. No.

ECF No. 109, PageID.3454. Ms. Pop further testified that the amount provided to Plaintiffs by the dispatcher is not the same amount as the amount invoiced. That amount was not provided to Plaintiffs. *Id.*, PageID.3443.

  In 2014, another owner-operator, Marius Rizac, filed a breach of contract action against Defendants. ECF No. 109, PageID.3463. Mr. Rizac had the same contract as the owner-operators in this lawsuit. *Id.*, PageID.3464. Like the Plaintiffs, Mr. Rizac claimed that the Defendants had not paid him 80% of the gross revenue for each load. *Id.* Ultimately, a judgment was entered against the Defendants, who had to pay Mr. Rizac money damages on his breach of contract claim. *Id.* Mr. Pop did not take any action to compensate the other owner-operators who were under identical contracts. *Id.* Nor did the Defendants make any changes in their payment procedure. *Id.*

### III. LAW & ANALYSIS

#### A. Standard of Review

  Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light

most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

    **B. RICO**

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). There are four elements to prove such a claim: (1) the conducting of; (2) an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479 (1985). Racketeering is defined under section 1961(1) to include any act "chargeable" under several generically described state criminal laws or any act "indictable" under numerous specific federal criminal offenses, including mail and wire fraud. 18 U.S.C. § 1961(1).

### 1. Conducting or Participating in the Fraudulent Scheme

As to whether the Defendants conducted or participated in a fraudulent scheme, Plaintiffs may show that Defendants conducted or participated in, directly or indirectly, the enterprise's affairs where there is evidence that the Defendants participated in the "operation or management" of the enterprise. *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 791-92 (6th Cir. 2012). Here, Defendant Maria Pop is the President of RSP and 51% owner. ECF No. 109, PageID.3441 Her primary duty is supervising account receivables and payables. *Id.*, PageID.3442. Defendant Razvan Pop is the Vice President of RSP Express and 49% owner. *Id.*, PageID.3441. His primary duty is supervising operations, including dispatch. *Id.*, PageID.3442. Defendants Razvan and Maria Pop were both aware that RSP was reporting less revenue to the Plaintiffs than what the company received. *Id.*, PageID.3454. Moreover, both testified that the owner-operators were only given the Settlement Statements, which did not include the total revenue received by RSP. *Id.,* PageID.5454; ECF No. 49, PageID.1598.

Here, Defendants' scheme was conducted through RSP as a means to allow the individual Defendants to defraud Plaintiffs. The individual Defendants used the separate incorporation of RSP to facilitate the racketeering activity. The evidence shows that gross revenue data was segregated between internally facing and externally facing documents with substantially different gross revenue

8

numbers. The Driver Payroll reports were prepared for the purpose of showing the Defendants complied with the contract and that the owner-operators received 80% of the gross revenue. However, the revenue number in the Driver Payroll History was not the actual gross revenue—that amount was found on the invoices that were kept hidden from the Plaintiffs. The two sets of revenue were kept separate and apart from one another to allow Defendants to prepare the weekly Settlement Statements based on the Driver Payroll History reports that included false revenue numbers that were used to justify how much they were being paid. The weekly Settlement Statements that were mailed to the Plaintiffs were prepared by RSP employees and printed on RSP forms. Defendants have come forward with no contradictory evidence showing there is a genuine issue of material fact as to whether the Defendants conducted and participated in the fraudulent scheme.

### 2. Enterprise

Next, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4). While the "enterprise" itself cannot be liable, a corporate parent can be liable under RICO for participating in an association-in-fact that includes itself, its owners, its subsidiaries, and its employees. *Fleischhauer v. Feltner*, 879 F.2d 1290, 1296-97 (6th Cir. 1989). "[A]n enterprise includes any union or group of individuals

associated in fact" meaning "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981). An "association-in-fact" "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id*. at 583. An association-in-fact requires three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

A claim under § 1962(c) requires proof of the existence of two distinct entities–a "person" and an "enterprise." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Plaintiffs may show "distinctness" in a RICO case involving an "association in fact" where the individual defendants are "persons" and together formed a racketeering "enterprise." *Fleischhauer*, 879 F.2d at 1296-97. Here, Defendant Maria Pop owns 51% of the shares of RSP and Defendant Razvan Pop owns 49%.

In *Cedric*, the United States Supreme Court held that the "distinctness" principle is met where a corporate employee acts within the scope of his authority conducting the corporation's affairs in a RICO-forbidden way. *Id.* at 163. In this case, there is no longer a genuine issue of material fact as to the relationship and distinct roles that exist between the corporate Defendant and the individual

10

Defendants. Defendants are "persons employed by or associated with any enterprise." The "enterprise" is the association-in-fact between RSP and the two individual Defendants. Under *Cedric*, the individual Defendants are distinct legal entities, even when they own or act solely on behalf of the corporation. As for RSP, the corporation can be a "person" for purposes of RICO and was a mere vehicle that allowed the individual Defendants to commit fraud. Each was its own separate and distinct legal entity. The individual Defendants used the separate incorporation of RSP to facilitate the racketeering activity. RSP was a registered motor carrier, which was necessary to defraud the owner-operators. There was a relationship among those associated with the enterprise sufficient to permit them to pursue the enterprise's purpose for almost a decade. Defendants have likewise failed to come forward with any evidence showing a material question of fact exists as to whether Defendants were part of an enterprise.

### 3. Pattern of Racketeering Activity

Plaintiffs have also demonstrated that Defendants engaged in a pattern of racketeering activity. "Pattern" is defined under section 1961(5) to require at least two acts of racketeering activity, the last of which occurred within ten years after the prior act of racketeering. The mail fraud statute prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341. Here, there is conclusive evidence that

Defendants engaged in thousands of acts of mail fraud within a ten-year period of time by mailing fraudulent weekly Settlement Statements to more than one hundred owner-operators/drivers.

Defendants incorrectly argue that the mail fraud statute requires the money to be in the victim's possession at the time of the fraud. Contrary to Defendants' argument, a defendant can be held liable for mail fraud where the defendant uses the mail to fraudulently conceal an obligation to pay money. *Porcelli v. United States*, 303 F.3d 452, 456 (2d Cir. 2002). None of the cases relied upon by Defendants hold that money or property must be taken from the current possession of a victim. *See Cleveland v. United States*, 531 U.S. 12, 15 (2000)(holding that municipal licenses are not property under the mail fraud statute, but mere intangible rights unrelated to money or property); *McNally v. United States*, 483 U.S. 350 (1987)(Court held that a right to honest government services was not related to money or property, but an intangible right).

Defendants' argument that Mr. Pop paid the drivers less than the total revenue in an effort to equal out the compensation between drivers contradicts the contracts which contained a no modification provision at Paragraph 20, as well as Marinescu's testimony that there were no written agreements to modify the 80% of total revenue contract price. Moreover, the Defendants fairness defense is contrary to the actions that Mr. Pop took after the *Rizac* case was decided. Even after a

judgment was entered against RSP in the *Rizac* case, Razvan Pop took no actions to compensate the other owner-operators who were under identical contracts, to inform the owner operators of what had happened, or to make any changes whatsoever. In other words, he continued the scam.

Defendants also assert in footnote 7 of their brief that "[t]he language in the agreements upon which Plaintiffs rely pertaining to the gross revenues upon which the 80% revenue shares were to be calculated obviously meant gross revenues attributable to the routes traversed by drivers of the companies who transported freight for RSP Express customers in the United States." ECF No. 112, PageID.3502. Defendants' bare bones assertion without any evidentiary support is insufficient to demonstrate a question of fact exists on Plaintiffs' RICO claim. See Fed. R. Civ. P. 56(c)(1) (Parties must support assertions of fact by "citing to particular parts of materials in the record . . . ."). Similarly, Defendants' argument that none of the Defendants "admitted to having engaged in a pattern of RICO racketeering activity, a scheme to defraud, use of the mails to further such an alleged scheme, and/or that any of them intended to deprive any Plaintiff or class member of money or property[,]" is not well taken. While Defendants may not have used the exact words, they admitted to facts showing an intentional pattern of activity that shows there is no material question of fact on Plaintiffs' RICO claim.

Defendants Marinescu, and Mr. and Mrs. Pop all admitted that Mr. Pop would pay the drivers less than 80% of RSP's gross revenue "to be fair." All similarly admitted the actual gross revenue amount was never disclosed to the Plaintiffs and concealed via the Settlement Statements, which were mailed to the Plaintiffs. A review of the Driver Payroll History and Fleet Revenue reports, the latter of which was never given to the Plaintiffs, reveals that the actual gross revenue on the Fleet Revenue report grossly exceeded the gross revenue reflected on the Driver Payroll records. The total for the years 2012 through 2014 suggests Plaintiffs were shorted more than $3,000,000.00.

Defendants also reassert arguments already considered and rejected by this Court. For instance, Defendants argue the Plaintiffs lack standing because they are not the real parties in interest. This argument has been addressed by this Court in its October 15, 2020 Opinion and Order, where the Court concluded that "Defendants' contention fails to address the Agreements' language and the close link between the individual Plaintiffs and their named companies." Dkt. No. 18, PageID.527. Defendants continue to ignore the operative contractual language: "THIS AGREEMENT made and entered into this Sept. 9, in the year 2013, by and between RSP EXPRESS INC. hereinafter referred to as 'Carrier' and DMR EXPRESS (MARIUS RENDENCIUC) referred to as 'Contractor.'" Dkt. No. 1, PageID.26.

Since this decision, Plaintiffs have come forward with additional Agreements containing both an individual owner-operator and his or her company as signed parties. The Plaintiffs also confirmed through their deposition testimony that the Agreements were between themselves and RSP. ECF No.64, PageID.2737. Defendants continued reliance on *Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1994) is misplaced. The *Warren* court concluded that the plaintiff lacked standing to sue in his individual capacity as his company's creditor, sole shareholder, and chairman of the board. The *Warren* plaintiff alleged injuries different from those the company suffered. *Id*. at 544-45. In this case, Plaintiffs' injuries mirror their companies' injuries. Plaintiffs have standing to assert their claims.

Additionally, because the Court has already concluded, *supra*, that the Defendants concealed the existence of Plaintiffs' claims by providing them with false numbers when they first agreed to transport the load, as well as by supplying them with the same false numbers in the Settlement Statements, Plaintiffs' claims did not begin to accrue until January 3, 2018, when driver Gabriel Biclea first suspected Defendants were defrauding them. This action was filed in December 2019, well within the two-year period allowed under MICH. COMP. LAWS § 600.5855. *See also Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S.

15

Dist. LEXIS 26611 (E.D. Tenn. Apr. 10, 2007) (concluding that estoppel is not an available defense in RICO actions).

Finally, Defendants' attempt to relitigate issues already raised and addressed by this Court is precluded by the law-of-the-case doctrine, which "provides that the courts should not reconsider a matter once resolved in a continuing proceeding." *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 338-39 (6th Cir. 2016); *see also* ECF No. 75, PageID.2816 (declining to impose the doctrine of judicial estoppel against Plaintiff Biclea).

## IV. CONCLUSION

Accordingly, for the reasons articulated above, Plaintiffs' Motion for Partial Summary Judgment [#109] is GRANTED.

SO ORDERED.

Dated: September 17, 2024

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 17, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager

16